UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                          MASTER FILE NO. 12-md-02311

_____

In Re: Fuel Senders                           HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:                     2:12-cv-00301

Direct Purchaser Actions

_____/

## OPINION AND ORDER DENYING DEFENDANTS'
## COLLECTIVE MOTION TO DISMISS VITEC'S COMPLAINT

Before the Court is Defendants' Collective Motion to Dismiss all claims in the

Complaint filed by Direct Purchaser Plaintiff VITEC, L.L.C. (12-301, Doc. No. 54).  The

Court heard oral argument on February 12, 2014, and at the conclusion of the hearing,

took this matter under advisement.  For the reasons that follow, the motion is **DENIED**.

## I.  INTRODUCTION

The United States Judicial Panel on Multidistrict Litigation ("Judicial Panel" or

"Panel")  transferred actions sharing "factual questions arising out of an alleged

conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of automotive wire

harness systems" to the Eastern District of Michigan on February 7, 2012.  (12-md-

02311, Doc. No. 2).  The litigation was centralized in this District to prevent duplicative discovery and inconsistent pretrial rulings as well as to conserve resources.  (Id.)

After complaints were filed alleging conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the cases, particularly in light of the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.  The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed In re: Automotive Parts Antitrust Litigation.  (Doc. No. 117 in 12-2311).  Twenty-eight component part cases are pending.  (See Doc. No. 665 in 12-2311).

On March 12, 2013, Direct Purchaser Plaintiff VITEC, L.L.C. ("VITEC" or "DPP") filed its Class Action Complaint ("CAC") for the Fuel Senders.  (Doc. No. 1 in 13-11093; Doc. No. 27 in 12-301 (sealed)).  Defendants assert that the CAC must be dismissed for four reasons:  it fails to meet the minimum requirements for pleading an antitrust conspiracy; DPP lacks constitutional or antitrust standing; the CAC fails to plead fraudulent concealment with particularity; and DPP is not entitled to injunctive relief because the allegations of threatened future injury are not plausible.

Because the same arguments were raised and addressed in the Court's prior ruling on a motion to dismiss the wire harness direct purchaser plaintiffs' complaint, the Court relies on the analysis from the opinion to the extent that no distinction between the two cases is needed.

## II.  FACTUAL ALLEGATIONS

The CAC contains party allegations, class allegations, and allegations about the product, the nature of the conspiracy, the market conditions, the government investigation, and guilty pleas entered by Defendants.  The allegations are set forth below.

### A.  The Parties

Direct Purchaser Plaintiff, VITEC, a Michigan limited liability company, brings this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States arising out of its purchase of Fuel Senders, which measure the amount of fuel in the gas tank.  (Id. at ¶ 4). Plaintiff manufactures fuel tanks for automobiles; it buys Fuel Senders to put into the gas tanks it manufacturers.  (Doc. No. in 12-2311, Tr. at 146).   VITEC alleges that it purchased Fuel Senders directly from one or more Defendants during the Class Period.  (CAC at ¶¶ 2, 11).  It

According to the CAC, (Doc. No. 27 at ¶ 1), Defendants engaged in a "conspiracy to rig bids and fix, raise, maintain, or stabilize prices at supra-competitive levels for Fuel Senders sold in the United States.  Defendants include Yazaki Corporation, Yazaki North America, Inc. (collectively "Yazaki"), and Denso Corporation, Denso International America, (collectively "Denso").  Direct Purchaser Plaintiff alleges that Yazaki North America, Inc. and Denso International America acted as "authorized, ordered, and condoned by their parent companies."  (CAC at ¶ 20).  All Defendants acted as principals or agents for other Defendants relative to the acts, violations, and the common course of conduct alleged in the CAC.  (CAC at ¶ 21).

3

### B.  Class Allegations

VITEC alleges that it purchased Fuel Senders "directly from Defendants." (CAC at ¶¶ 11, 37, 40 ) during the Class Period.  The Class Period is identified as early as January 1, 2001, until the present.  (Id.).

### C.  Product and Nature of the Conspiracy

According to VITEC, during the Class Period, Defendants and their co-conspirators conspired to allocate the supply of Fuel Senders and raise, fix, and maintain prices for Fuel Senders sold in or into the United States."  (CAC at ¶ 50).

Defendants agreed to coordinate price adjustments requested by OEMs in the United States (CAC at ¶ 55).  The conspiracy involved manipulation of the bids submitted in response to the Request for Quotation ("RFQ") process.  (CAC at ¶ 57). Typically, the RFQ process begins three years before vehicle production.  (CAC at ¶ 59).  An OEM issues the RFQ to multiple suppliers, who submit bids and revised bids prior to the selection of the winning bid.  (CAC at ¶ 58).  The bid holds through the life of the vehicle model, on average five years.  (Id.)  In addition, suppliers that were not awarded the bid purchase Fuel Senders directly from the winning bidder for incorporation in to the products they produce and sell to OEMs, and pay, at a minimum, the winning price.  (CAC at ¶ 62).  The winning bidder receives a contract for the life of a vehicle model, approximately five years.  (CAC at ¶ 60).

### D.  Market Conditions and Opportunities for Collusion

DPP alleges that the market conditions are conducive to collusion.  (CAC at ¶ 42).  Significant barriers to entry into the fuel sender market exist, including start-up

capital expenses.  (CAC at ¶¶ 43-47).  According to DPP, "A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor."  (CAC at ¶ 44).  In addition, a new entrant faces difficulty breaking into a market because of contracts between suppliers and large-volume purchasers.  (Id. at ¶ 45).

Another market condition identified in the CAC is the inelasticity of pricing.  Here, OEMS must use Fuel Senders because there is no viable substitute product.  (CAC at ¶ 47).  The cartel can raise prices above a competitive level without suffering a substantial reduction in sales.  (CAC at ¶ 46).

The existence of industry events facilitate opportunities to meet, conspire, and share information.  (CAC at ¶ 48).  According to VITEC, Defendants "attended pre-bid meetings sponsored by OEMs to disseminate information regarding requests for quotation ("RFQs"), bid specifications, and design and engineering features and communicated with each other regarding these issues."  (CAC at ¶ 49).  These meetings afforded Defendants' representatives the opportunities to meet and engage in collusive conduct.  (Id.)

### E.  Government Investigation and Guilty Pleas

According to the Class Action Complaint, Yazaki agreed to plead guilty to a three-count criminal information for engaging in a conspiracy to fix the prices of Fuel Senders and other automotive parts.  Yazaki agreed to pay a $470 million criminal fine.  (CAC at ¶ 72).  The fine is the second largest imposed on a single company in federal antitrust history.  Denso agreed to plead guilty to a two-count criminal information and

5

paid a total of $78 million in criminal fines for anticompetitive conduct involving two different component parts that are part of In re Automotive Parts Litigation. (CAC at ¶ 73). DPP asserts that Yazaki and Denso have histories of collusion and have been involved in antitrust investigations with respect to other automotive parts. The price-fixing is alleged to have impacted multiple bids submitted to OEMs as well as the prices paid by all direct purchasers. (CAC at ¶ 69).

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted." When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (observing that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . . Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th

Cir. 2009).

## IV. ANALYSIS

### A. Plausibility of the Antitrust Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In Twombly, the Supreme Court considered the pleading requirements needed to withstand a motion to dismiss a Section 1 Sherman Act claim.  It held that a complaint must contain "enough factual matter (taken as true) to suggest" the existence of an agreement.  550 U.S. at 556.

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

Id.

The Court begins its analysis here, as it did in the wire harness case, with a recap of the facts before the Supreme Court in Twombly.  The plaintiffs brought a consumer antitrust class action against local telephone and telecommunications carriers alleging the defendants conspired to restrain trade.  According to the plaintiffs, the defendants engaged in parallel conduct to "inhibit the growth" of companies new to the market and agreed not to compete with each other.  550 U.S. at 550-551.  The defendants moved to dismiss the complaint on the ground that it failed to include factual allegations from which an express or tacit agreement could be inferred.  Id. at

552.  The Supreme Court observed that "[a]n antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict. . . [and] proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action."  Id. at 554 (citation omitted). The Twombly Court added that "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."  Id. (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).

Because the Supreme Court dismissed the antitrust claim in Twombly, the decision does not stand as an example of the type of allegations that would satisfy the plausibility standard.  Nevertheless, the Supreme Court provided general guidance.  It indicated that a "heightened fact pleading of specifics" is not needed to state an antitrust conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough.

Defendants maintain that the CAC does not satisfy Ashcroft v. Iqbal, 556 U.S. 662 (2009); however, Iqbal did not alter the pleading requirements set forth in Twombly. Iqbal answered the question of whether Twombly was limited to antitrust claims or applied universally.  Iqbal, 556 U.S. at 684.  The Supreme Court summarized its decision in Twombly as follows:

> Our decision in Twombly illustrates the two-pronged
> approach. There, we considered the sufficiency of a
> complaint alleging that incumbent telecommunications
> providers had entered an agreement not to compete and to
> forestall competitive entry, in violation of the Sherman Act,
> 15 U.S.C. § 1. Recognizing that § 1 enjoins only
> anticompetitive conduct 'effected by a contract, combination,
> or conspiracy," Copperweld Corp. v. Independence Tube
> Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628
> (1984), the plaintiffs in Twombly flatly pleaded that the
> defendants 'ha[d] entered into a contract, combination or

8

conspiracy to prevent competitive entry. . .and ha[d] agreed not to compete with one another.'  550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' 'parallel course of conduct. . .to prevent competition' and inflate prices was indicative of the unlawful agreement alleged.  Ibid. (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.  Id., at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the 'nub' of the plaintiffs' complaint 'the well-pleaded, nonconclusory factual allegation of parallel behavior' to determine whether it gave rise to a 'plausible suggestion of conspiracy.'  Id., at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. Id., at 567, 127 S.Ct. 1955.  Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.  Id., at 570, 127 S.Ct. 1955.

Iqbal, 556 U.S. at 679-80.

This Court rejected the wire harness defendants' argument that Twombly required dismissal of the wire harness case.  This Court held the case could proceed because the complaint included sufficient allegations to inform the defendants what wrongdoing they were alleged to have committed and enabled the defendants to respond to the allegations.  Further, the Court concluded that after reviewing the allegations together, the complaint contained plausible grounds to infer an agreement. Plausible grounds were set forth in allegations about the government investigations,

which were used to bolster the plausibility of § 1 claims; the guilty pleas by multiple defendants; the structure of the wire harness industry; and the allegations demonstrating Defendants' opportunity to meet and collude.

Although DPP advances similar allegations here, Defendants argue that distinctions in the allegations advanced in this case warrant dismissal. The Court discusses the distinctions below, but observes at the outset that the question driving the Court's analysis is not whether a conspiracy existed; it did, but whether the allegations as to how far it reached are plausible.

### 1. Status of VITEC

Defendants focus on the missing factual allegations in the CAC: whether DPP purchased Fuel Senders for new vehicles or repair parts, what prices were paid, or from whom the purchases were made. Defendants observe that the omissions are troubling inasmuch as Direct Purchaser Plaintiff has had access to documents from a government investigation.

Despite Defendants' concern, there is no heightened pleading standing in an antitrust case when a plaintiff has had access to some information from the government investigation. Here, DPP alleges it purchased Fuel Senders from "one or more Defendants and/or their co-conspirators," (CAC at ¶¶ 11, 37, 40), and it has satisfied its pleading burden. See Starr v. Sony BMG Music Entertainment, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the contention that Twombly requires a plaintiff to identify specifically the time, place, or person related to each allegation of conspiracy).

10

### 2.  Market Allegations

The direct purchaser plaintiffs' complaint in the wire harness case included allegations of the market share of each defendant, which combined reached 66%.  In contrast, here, VITEC fails to even allege that Defendants controlled a majority of the market.   Defendants assert that the lack of specificity undermines any basis upon which to assess the size of the market or the number of other suppliers in the Fuel Sender market.

Defendants are correct that the CAC includes no allegation as to the number of manufacturers in the market.  Nevertheless, Direct Purchaser Plaintiff includes allegations reflecting a market ripe for the type of collusive activity that took place:  the market is highly concentrated, with high barriers to entry, and inelastic pricing.  (CAC at ¶¶ 43-46).  A review of case law demonstrates that these allegations meet DPP's pleading burden.  See In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1014 (E.D. Mich. 2010) ("oligarchic sellers" conducive to collusion as are "prohibitive entry barriers"); Standard Iron Works v. Arcelormittal, 639 F. Supp. 2d 877, 883 (N. D. Ill. 2009) ("high barriers to entry" conducive to collusion); In re Carbon Black Antitrust Litig., No. A-03-10191, 2005 WL 102966 at *6 (D. Mass. Jan. 18, 2005) (denying motion to dismiss because the plaintiffs alleged, among other things, market conditions that would facilitate the maintenance of an illegal agreement).

### 3.  Guilty Pleas/Global Nature of the Conspiracy

It is undisputed that price-fixing in the Fuel Sender market occurred.  Yazaki admits to conspiring to fixing the prices of Fuel Senders in its guilty plea.  Denso

11

admitted to conspiring to fix prices of other component parts. The parties disagree as to how far these pleas can be stretched; more specifically, whether the guilty pleas can be stretched to cover Denso, or stretched beyond the single OEM identified in the sealed complaint, or the time frame admitted in the guilty plea. Defendants assert that VITEC has overreached in the CAC in that the factual allegations do not support the existence of a conspiracy beyond Yazaki's admission relative to a particular OEM. The Court disagrees.

The content of the guilty pleas does not render a conspiracy beyond the identified OEM implausible. In its Class Action Complaint, DPP links Yazaki's guilty plea regarding Fuel Senders sold to a particular OEM, but also alleges that DPP paid more for Fuel Senders than it otherwise would in a competitive market. (CAC at ¶ 84). VITEC also alleges that as a result of Defendants' conspiracy "price competition has been restrained, suppressed or eliminated," and "prices of Fuel Senders have been raised, fixed, maintained, or stabilized at supra-competitive levels." (CAC at ¶ 83). VITEC also alleges that Defendants' "anticompetitive acts were intentionally directed at the United States market for Fuel Senders and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Fuel Senders throughout the United States." (CAC at ¶ 99).

A review of these factual allegations and the inferences favorable to DPP, which must be drawn by the Court, distinguish this case from those relied upon by Defendants. Specifically, this case presents "the 'larger picture' from which inferences of a wider conspiracy can be drawn. . . ." In re Iowa Ready-Mix Concrete, 786 F. Supp. 2d 975, 979 ( N.D. Iowa 2011) (involving bilateral agreements and geographically

limited market).  The ongoing investigation into price-fixing in automotive component

parts has resulted in myriad guilty pleas.  Here, the CAC describes Defendants' guilty

pleas.  (CAC at ¶¶ 72 and 73).  Yazaki admitted it agreed to fix prices for Fuel Senders

and coordinate price adjustments.  Although Denso did not plead guilty to fixing the

price of fuel senders, it has pleaded guilty to this conduct involving other automotive

component parts.   The court in In re Static Random Access Memory (SRAM) Antitrust

Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008), found that a guilty plea involving "the

same actors associated with certain Defendants" created an inference of conspiracy as

to a second product where the defendants "were responsible for marketing" both.

Compare In re TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827, 2010 WL 2629728

(N.D.Cal. June 29, 2010) (rejecting the plaintiffs' position that the defendants'

involvement in a conspiracy relating to one product renders more plausible a conspiracy

claim relating to a product deemed a close substitute in the absence of similar

commonality between the circumstances). Moreover, In re: Automotive Parts Antitrust

Litigation arises out of the largest investigation into antitrust violations ever undertaken

by the Department of Justice.  The number of guilty pleas that have been entered in this

multi-district litigation suggest the anticompetitive conduct was business as usual, not

the work of a rogue employee.

Consequently, the viability of DPP's CAC does not build on allegations of parallel

conduct.  Compare In re Travel Agent Commission Antitrust Litig., 583 F.3d 896 (6th

Cir. 2009) (alleging only parallel conduct with "no setting" to suggest the existence of an

agreement).   Although DPP has alleged a conspiracy that expands beyond price-fixing

Fuel Senders sold to a particular OEM, it has limited its claims to defendants operating

13

in the Fuel Sender market.   The CAC identifies the time frame of the conspiracy, and the market conditions that support the plausibility of a broader conspiracy than that to which Defendants have pleaded guilty.  The Court recognizes that the standard of proof in the criminal proceedings is a much higher standard than must be met in this litigation. Consequently, the guilty plea establishes the existence of the conspiracy, but does not set boundaries confining the scope or time frame.  See  In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d 1179, 1185 (N.D. Calif. 2009).

When read in its entirety, the CAC articulates a plausible antitrust claim based upon the market structure, the government investigations, and the guilty pleas. Compare In re Air Cargo Shipping Servs. Antitrust Litig. No. MD 06-1775, 2009 WL 3443405 at *1 (E. D. N. Y. Aug. 21, 2009) (holding that admissions of price-fixing by so many defendants rendered a conspiracy claim plausible).   At this stage of the litigation, these allegations are sufficient.  DPP identified the parties to the conspiracy, the products involved, the geographic market affected, and the time frame of the conspiracy.  DPP also alleged methods used to implement the conspiracy.

Not only do Defendants have notice of the claims against them, the allegations create "a reasonable expectation that discovery may reveal further evidence of an illegal agreement."  In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1007-08.  The fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action.  In re Packaged Ice Antitrust Litig, 723 F. Supp. 2d at 1011.  Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir.

14

2002).  The key to the CAC's survival is whether it contains plausible grounds to infer an agreement; not whether an agreement is probable.  In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009).  Such grounds exist.

### B.  Viability of Claim for Damages

The parties dispute whether VITEC may bring a claim for damages under the Sherman Act, which requires VITEC to demonstrate it has antitrust standing.  See Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402 (6th Cir. 2012) aff'd on other grounds, 2014 WL  (S. Ct. 2014).  "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry."  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc).

In Static Control Components, 697 F.3d at 402, the Sixth Circuit addressed the factors assessed and balanced when deciding whether a claimant has satisfied his burden to adequately plead antitrust standing.  First, the plaintiff must allege "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused."  Id.  Second, the court considers "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market."  Id.  Third, the court looks at "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative."  Id.  Fourth, the court must assess "the potential for duplicative recovery or complex apportionment of damages."  Id.  Finally, the court must consider "the existence of more direct victims of the alleged antitrust violation."  Id. (citations omitted).

After reviewing the allegations set forth in the CAC, the Court is satisfied that VITEC has adequately pleaded antitrust standing.  First, the complaint includes

15

allegations that VITEC purchased Fuel Senders directly from one or more of the Defendants and/or co-conspirators during the Class Period (CAC at ¶ 11, 37, 40), and that Defendants' conspiracy impacted the prices DPP paid for Fuel Senders. (CAC at ¶¶ 1, 84, 100-01). Although Yazaki did not plead guilty to bid-rigging, DPP alleges Defendants manipulated the Request for Quotation process, and "knew and intended that their actions regarding their sales of Fuel Senders to OEMs would have a direct impact on prices for Fuel Senders sold to all direct purchasers of Fuel Senders throughout the United States." (CAC at ¶ 68). The allegations of price increases satisfies DPP's burden. See In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig., CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) (finding it unnecessary for the direct purchasers to "state the actual price that they paid" because they alleged the purchases were made directly from the defendants during the time frame of the conspiracy to fix prices). Moreover, because VITEC purchased Fuel Senders directly from Defendants, there is no need for complex apportionment of damages. As a direct purchaser, it is a direct victim of the alleged conspiracy.

The balancing test is satisfied despite the lack of detailed allegations regarding the connection between Fuel Senders sold to a particular OEM and the conspiracy alleged in the CAC. To link the purchases of Fuel Senders to the alleged conspiracy, DPP links its purchases to the conspiracy with an allegation that VITEC purchased Fuel Senders in the United States from one or more of the Defendants or their co-conspirators, and that the anticompetitive conduct impacted the independent bid process, resulting in supracompetitive prices. (CAC at ¶ 84). Further, DPP alleges that the conspiracy was intended to and did affect the sales prices of Fuel Senders to

16

buyers in the United States, not just to the OEM. (CAC at ¶ 68-69).

In addition, VITEC contends that these facts create joint and several liability.  It relies on Paper Sys., Inc. v. Nippon Paper Indus., 281 F3d 629 (7th Cir. 2002) (reversing dismissal of manufacturer that had not sold directly to a plaintiff), a case addressing the effect of joint and several liability on the analysis of damages in an antitrust lawsuit.  The plaintiffs alleged that five manufacturers conspired "to reduce output and raise prices in the thermal facsimile paper business." Id. at 631.  Because the defendants used different distribution systems to sell paper, a particular plaintiff might be a direct purchaser of one defendant, but not the others.  Id. at 632.  The court concluded that only direct customers could recover damages for overcharges from a particular defendant, but because the defendant's status as a member of a cartel remained undetermined, it remained in the case as "jointly and severally liable for the entire overcharge" caused by the conspiracy.  Id. at 634.

The allegations, when viewed in the light most favorable to VITEC, satisfy its burden.  In sum, DPP has "causally linked" its antitrust  injury to "an illegal presence in the market." Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  It alleges it paid a higher price for Fuel Senders purchased from Defendants than it would have paid absent the alleged conspiracy.  In re Titanium Dioxide Antitrust Litig., No. 10-0318, 2012 WL 3711890, at * 10 (D.Md. Aug. 28, 2012) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968) (observing that a prima facie case of injury and damage is met when a plaintiff shows that he paid an illegally high price and shows that the amount of the overcharge)).

17

## C. Sufficiency of the Fraudulent Concealment Allegations

VITEC filed the initial Fuel Sender complaint on March 12, 2013, and alleges a conspiracy from at least as early as January 1, 2001.   Defendants maintain that any claims for damages suffered from the conspiracy before March 12, 2009, are barred because the statute requires claims be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997).

DPP asserts that the discovery rule tolled the statute of limitations.  In the CAC, VITEC alleges that the February 2010 date of the raids on certain defendants by government authorities is the first date it could have discovered its injury.  Therefore the statute is tolled.  In re: Scrap Metal Antitrust Litig., 527 F.3d 517, 536 (6th Cir. 2008).

 Whether the claims prior to June 2008 are barred turns on whether the statute was tolled by the fraudulent concealment doctrine.   A plaintiff must plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir.1991).  Because DPPs' failure to discover the operative facts during the limitations period is not at issue, the Court limits its discussion to the two disputed elements.

18

### 1. Wrongful Concealment

To show "wrongful concealment," a plaintiff must show something more than silence or an unwillingness to reveal wrongful conduct.   Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d 761, 770 (6th Cir. 2002).  A plaintiff must allege the existence of a "trick or contrivance intended to exclude suspicion and prevent inquiry." Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) (quotation omitted).

Notably, the allegations found to be sufficient for wrongful concealment in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In that case, the  plaintiffs relied on findings from the European Commission that conspirators "established security rules to prevent a paper trail. . .and used a coding-system to hide the identity of the producers in their documents and spreadsheets."  Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated "active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

Here, VITEC alleges that the earliest notice was February 2010, the date that several companies were raided.  There was no information in the public domain about the rigged bids for Fuel Senders; Defendants met and communicated in secret, and agreed to keep the facts from discovery.  (CAC at ¶¶ 71j. 90, 92).  Defendants used code names and met at private residences or remote locations (Id. at ¶ 67).  They also monitored and enforced the conspiracy.  (CAC at ¶¶ 56, 66-67, 71i).

The Court found similar allegations sufficient to demonstrate wrongful

concealment in the wire harness case, see In re Auto. Parts Antitrust Litig.,

12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not

provided grounds for distinguishing the situation here from the decision in the wire

harness case.  The Court finds that DPP has met its burden to show wrongful

concealment.

### 2.  Due Diligence

In deciding whether VITEC has met its burden as to this element, the Court

again uses the decision in Carrier Corp., 673 F.3d at 448-49  (declining to hold that the

plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of

litigation and without the benefit of discovery" to guide its analysis) (citing Jones v.

TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's

reluctance to dismiss fraudulent concealment allegations prior to discovery)).  See also

Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe

allegations of fraudulent concealment liberally and in the plaintiff's favor at such an

early stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only

if, "it is obvious from the complaint that the plaintiff conducted absolutely no

investigation."  Id. (citation omitted).   Actions that would deceive a reasonably diligent

plaintiff toll the statute.

In Carrier Corp., the Sixth Circuit was satisfied that due diligence had been

pleaded because the plaintiff detailed the steps it had taken once it became aware of

the investigation.  See 673 F.3d at 448.  In the CAC, DPP alleged that it had no

knowledge and that it could not have discovered the conduct earlier through the

exercise of reasonable diligence.  (See CAC at ¶¶ 85-86, 91, 90-94).  At this stage of

the litigation, there simply is no basis for finding DPP ignored available information that would have aroused suspicion and prompted an investigation. In sum, DPP has included allegations as to each element that must be proven to toll the statute of limitation.

**D. Sufficiency of the Injunctive Relief Request**

Lastly, VITEC asks the Court for an injunction preventing Defendants from "continuing and maintaining" the price fixing conspiracy. (CAC, Prayer for Relief at ¶ D). The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.

In challenging the request, Defendants argue that the CAC lacks the factual support necessary to establish a real or immediate threat that VITEC will be harmed again. Specifically, Defendants contend that Defendants' guilty pleas have obviated the need for injunctive relief. Secondly, Defendants argue that Plaintiff never alleges that it intend to purchase Fuel Senders from Defendants in the future.

DPP has alleged facts from which a "cognizable danger of recurrent violation" can be inferred. See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). Specifically, VITEC alleges a decade-long global conspiracy in a market with high barriers to entry. The same market conditions exist today. See In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a nationwide class for injunctive relief based upon similar allegations). The fact that a defendant has pleaded guilty does "not obviate the threat that a conspiracy

21

will persist or resume in the future."  In re TFT-LCD (Flat Panel) Antitrust Litig., 267

F.R.D. 583, 597 (N.D. Cal. 2010) amended in part, M 07-1827 SI, 2011 WL 3268649

(N.D. Cal. July 28, 2011) (certifying a nationwide injunctive class under Rule 23(b)(2)).

## V.  CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATE: April 30, 2014

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the above date a copy of this Opinion and Order was served upon all Counsel of Record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager